

# Missouri Court of Appeals

## Southern District

### Division Two

STATE OF MISSOURI,              )
                               )
    Plaintiff-Respondent,       )
                               )
v.                             )    No. SD35356
                               )    Filed: February 14, 2019
CHRISTA ELAINE MUELLER,         )
                               )
    Defendant-Appellant.        )

APPEAL FROM THE CIRCUIT COURT OF PHELPS COUNTY

Honorable William E. Hickle, Circuit Judge

**<u>AFFIRMED</u>**

A jury found Christa Mueller (Defendant) guilty of assault in the first degree. *See* § 565.050.[1] She presents two points for decision. In Point 1, she challenges the sufficiency of the evidence to support her conviction. In Point 2, she contends the trial court plainly erred by failing to *sua sponte* declare a mistrial or issue a curative instruction when the prosecutor allegedly misstated the law regarding accomplice liability during the rebuttal

---

[1] All statutory references are to RSMo (2000). All rule references are to Missouri Court Rules (2018).

portion of closing argument. Finding no merit to either point, we affirm the trial court's judgment.

**Procedural Background**

Defendant and Calvin Alford (Alford) were charged by indictment with committing the class A felony of assault in the first degree by injuring L.H. (Victim). *See* § 565.050. The indictment charged that "the defendants, each of them acting in concert, knowingly caused serious physical injury to a seventeen month old child, [Victim], by striking and shaking [Victim] and in the course thereof inflicted serious physical injury to [Victim] which includes a traumatic brain injury, skull fracture, broken shoulder, and a fractured arm." The case against Defendant was brought to trial in September 2017.[2] The assault charge against Defendant was submitted to the jury on an accomplice liability theory. *See* § 562.041.1. The jury found Defendant guilty as charged. The trial court imposed a 20-year sentence, and this appeal followed.

**Discussion and Decision**

*Point 1*

Defendant's first point on appeal challenges the sufficiency of the evidence to support her conviction. "Appellate review of sufficiency of the evidence is limited to whether the State has introduced adequate evidence from which a reasonable finder of fact could have found each element of the crime beyond a reasonable doubt." ***State v. Lammers***, 479 S.W.3d 624, 632 (Mo. banc 2016). An appellate court "considers all evidence in the light most favorable to the verdict and grants the State all reasonable

---

[2] Defendant and Alford were tried separately.

2

inferences. Contrary evidence and inferences are disregarded." *Id*. (citation omitted). We do not weigh the evidence. *State v. Claycomb*, 470 S.W.3d 358, 362 (Mo. banc 2015). Instead, we defer to the fact-finder's "superior position to weigh and value the evidence, determine the witnesses' credibility and resolve any inconsistencies in their testimony." *State v. Lopez-McCurdy*, 266 S.W.3d 874, 876 (Mo. App. 2008). The State may prove its case by presenting either direct or circumstantial evidence connecting the defendant to each element of the crime. *State v. Hoosier*, 267 S.W.3d 767, 770 (Mo. App. 2008). Circumstantial evidence is given the same weight as direct evidence and the jury is free to draw reasonable inferences from the evidence presented. *Id*. Viewed from that perspective, the following evidence was adduced at trial.

In April 2006, Defendant lived in an apartment with Victim. Defendant had been in a relationship with Alford for approximately four months. Alford occasionally stayed at the apartment with Defendant and Victim. The environment in the residence was "chaotic" due to frequent yelling, screaming and fighting involving Defendant and Alford.

The charge against Defendant stemmed from conduct occurring in the early morning hours of April 6, 2006. On April 5, Defendant's neighbor, Stephanie Bundy (Bundy), saw Defendant and Victim at the apartment complex. Victim appeared to be okay. At approximately 6 a.m. on April 6, Bundy was awakened by the sound of Alford screaming at Defendant. When Bundy went downstairs to ask that Alford and Defendant quiet down, Defendant cracked open the door and was "standoffish." While Bundy was at the door, Alford called Defendant a "bitch," told her to "knock her shit off" and "shut the fucking door." Alford also told Defendant to "get in there and fix her shit."

3

Later that afternoon, Defendant phoned another of her neighbors, Jackie Mullins (Mullins). During that conversation, Defendant said she was concerned because Victim wasn't responding to her. Mullins told Defendant to call an ambulance. Mullins also called Bundy and asked her to check on Defendant and Victim. When Defendant answered the door, she was "very frantic and upset." Alford was pacing and mumbling. Victim was lying on the couch in the living room, unmoving. Victim's "pupils were completely fixed and dilated." Defendant said that she had given Victim some Benadryl. Bundy told Defendant to call 9-1-1, but Defendant was "hesitant." Defendant refused to call 9-1-1 until Bundy swore at her to do so, and told Defendant that it "would be better for you … if you did."

Paramedics responded to the call from Defendant's apartment at approximately 6 p.m. When the paramedics arrived, Victim was still lying on the couch, unresponsive. Defendant told paramedic Lisa Steelman (Steelman) that Victim fell from her crib two hours prior. Steelman was "furious" that Victim had been left in her condition for two hours. Following Steelman's reaction to Defendant's statement, Defendant and Alford began changing their stories back and forth to alter their account of when and how Victim's injuries had occurred. Steelman "couldn't get a straight answer after that." Steelman testified that Defendant did not ask any questions about Victim and was "not crying and not acting as I would feel that a mother in that situation would react." Steelman did not offer Defendant the opportunity to ride in the ambulance because she "felt that this baby had been intentionally harmed." Steelman noticed marks and a bruise on Victim's face. She also noticed finger-shaped bruises on Victim's right upper arm. Victim was

4

transported to Phelps County Regional Medical via ambulance and was subsequently life-flighted to Children's Hospital in St. Louis.

A child-abuse pediatrician, Dr. Marcella Donaruma (Dr. Donaruma), examined Victim and testified extensively about her condition and injuries.[3] When Victim arrived at the hospital, she was "near death[,]" had "impending breathing failure[,]" and exhibited injuries so severe that her survival was not certain. Dr. Donaruma described Victim as "altered." She had bruises on the front, the back, and protected areas. Specifically, Victim had bruises near her eyebrow, on her left jaw, right arm, shin, ankle, back of her leg, and back. Victim's right arm was fractured in three separate places. In Victim's chest, she had developed "pneumothoraces" that disrupted her breathing.[4] Both of Victim's eyes displayed hemorrhaging in multiple layers of the retina. Victim also had a skull fracture and extensive internal bleeding in her head. By the time Victim arrived at the hospital, all of her brain was injured. Victim had numerous contusions, areas of subdural bleeding, and subdural hemorrhages on both sides of her head.

Dr. Donaruma also testified about her conclusions regarding the cause of Victim's injuries. Dr. Donaruma opined that a single fall most likely did not cause Victim's injuries. According to Dr. Donaruma, a fall would be a highly implausible explanation for Defendant's injuries because it would not "adequately describe how a child could get both left and right, front and back, multi-system injury in the course of a single event." Dr.

---

[3] Dr. Donaruma was a board-certified pediatrician with an additional board certification in the subspecialty of child-abuse pediatrics.

[4] Dr. Donaruma testified that a "pneumothorax is where the air is inside of your chest but outside of the lungs because the tiny air sacks in the lungs have ruptured and the air escaped and that air is trapped and pushing on the lung tissue as they try to inflate."

5

Donaruma further opined that it was unlikely that Victim's injuries happened at the same time or resulted from a single strike or blow. The external bruises on Victim's body were "not consistent with the activities of daily living" because they were "located in areas that are typically protected and are not common injuries in the course of a child's activity and playing." For example, Dr. Donaruma was concerned about the distribution and shape of the bruising on Victim's leg because it looked like "she was gripped by the back of her leg." Victim's bruising and abrasions on her back were inconsistent with a fall and were "completely atypical for accidental injury in the course of daily living."

Dr. Donaruma concluded that most of Victim's bruising was consistent with inflicted trauma. Some of Victim's injuries, such as the bruise on her forehead in the shape of a right angle, were pattern injuries caused by Victim having been struck with a specific object. Dr. Donaruma concluded that such an injury would be inconsistent with Victim hitting her head on a plastic tote. Victim's jaw bruises were inconsistent with a fall; "[t]hat's something where a child gets held forcefully by the face." Dr. Donaruma noted that the severe "spiral" fractures in Victim's arm were inconsistent with a single fall or impact, including a fall from a crib. Rather, the fractures in Victim's arm were most likely caused by inflicted injury. The doctor concluded that Victim's pneumothoraces to the chest were caused by blunt force trauma. Victim's retinal hemorrhage, skull fracture, subdural bleeding and contusions were consistent with abusive head trauma and were not likely to have been caused by a fall.

Dr. Donaruma testified that Victim would have become "limp and minimally responsive" immediately after suffering the first significant brain injury. Additionally, the results of Victim's lab reports, measuring her blood sugar and coagulation levels, were not

6

consistent with an injury occurring within two hours of the test. Finally, Dr. Donaruma opined that, if Victim had received medical treatment earlier, she could have had a better outcome. To a reasonable degree of medical certainty, Victim "would have done better than she did" if she had received earlier medical attention.

Due to the severity and suspicious nature of Victim's injuries, a public safety officer was summoned to document Victim's condition upon her arrival at Phelps County Regional Medical. This was not the first occasion of suspected abuse or neglect involving Defendant and Victim. Bundy, who lived in the unit directly above, testified that from February through April 2006, she regularly heard concerning sounds coming from within Defendant's residence. Victim cried loudly and for long periods of time, "more often than she should have[.]" Through the apartment walls, Bundy heard Victim emit "high-pitched" and "bloodcurdling" screams. Victim's crying indicated to Bundy that, on more than one occasion, Victim was hurt, in pain, and being ignored.

Mullins, who also resided near Defendant in the apartment complex, testified that Defendant didn't have much patience with kids and "would yell a lot" because her "nerves would be frayed[.]" Mullins recounted that, on one occasion, she inquired about large, noticeable marks on Victim's face. During a separate incident, Mullins observed Defendant pick Victim up by the shoulder, shake her, and yell at Victim to "shut up and get the fuck off of her[.]"

A Children's Division caseworker, Christine Abmeyer (Abmeyer), was assigned to assist and monitor Defendant and Victim following a hotline call in January 2006. Victim had sustained grease burns to her hands, face and throat when Defendant was cooking with hot oil. Although the extensive burns made Victim "unrecognizable," Defendant did not

7

take her to the hospital until the day after the incident. When Victim was admitted to the hospital's burn unit, it was discovered that she had additional existing injuries including abrasions and bruising to her sternum. Upon Victim's release from the hospital, Defendant repeatedly failed to bring Victim to scheduled follow-up appointments and was "apathetic" in cooperating with the Children's Division. Because of Defendant's history of failing to take Victim to the doctor in a timely manner, Abmeyer formulated a safety plan. The safety plan dictated that, if any health concerns presented with Victim, Defendant would take Victim to the doctor immediately. Defendant agreed to the safety plan, but she did not utilize the resources provided by the Children's Division and "seemed to be not caring." On March 30, 2006, Abmeyer closed the case as a result of Defendant's noncompliance.

The trial testimony included a review of the multiple interviews that Defendant gave to authorities. In Dr. Donaruma's interview with Defendant, she gave a history that was "unusual … not typical for a mom with a child in the intensive care unit [and] disturbing." When asked to generally describe Victim, Defendant responded that Victim was ornery and mischevious, and "didn't like [Defendant] anymore because she was pregnant." Defendant referred to Victim as her "little butt plug" because she often followed Defendant closely. Dr. Donaruma found Defendant's comments to be "really disrespectful of the child in general." Moreover, Dr. Donaruma testified that Defendant did not seem upset about what was wrong with Victim, was "[n]ot very focused on the child," and instead tried to be engaging and distract them from the type of questions they were asking about the injury.

Defendant told Dr. Donaruma that on April 5, Victim had "a great day" with a typical schedule. The following day, Defendant claimed that Victim was comfortable in

8

her crib at 6 a.m., and when Defendant checked on Victim at 10 a.m., she was awake and quietly playing in her crib. According to Defendant, Victim ate throughout the day and took a nap at 3:30 p.m. Defendant said that around 5 p.m., she found Victim out of the crib, on the floor, draped over her toy box. Defendant said she thought Victim's crib broke. Defendant's explanation did not make sense to Dr. Donaruma because "this one little sort of possible tumble from a broken crib wasn't enough to explain just the distribution and number and type of injury we were seeing." Throughout the interview with Dr. Donaruma, Defendant did not ask any questions about Victim or her prognosis.

Defendant also was interviewed by Detective Richard Hanrahan (Hanrahan), a police officer who specialized in forensic child-abuse investigations. Defendant was initially hesitant to talk with Hanrahan because Defendant's parents had advised her not to speak with anyone about the incident.

Defendant made the following statements to Hanrahan. On the night of April 5, Alford and Defendant stayed at her apartment with Victim. On the morning of April 6, Victim woke up around 10 a.m. and was a little congested, so Defendant gave Victim some allergy medicine. Defendant and Victim lay down for a nap between 11 a.m. and noon. Victim woke up around 1 p.m., but was still a little sleepy, so Defendant moved Victim to her crib and put her down for another nap. Defendant and Alford stayed at the apartment throughout the day on April 6. Around 5 p.m., Defendant found Victim "on the floor next to the crib and the toy box." Victim's "head was to the side and on the floor and she was basically upside down with her lower legs over the toy box and somehow dropped there next to the crib and the toy box." Defendant and Alford then took Victim to the living room and tried to search for home remedies "for things like concussion because they feared

9

she may have suffered a concussion falling from the crib." Defendant had a hard time recounting the time frame because "she knew there was a pause between the time the baby was found and the time the ambulance was called."

When Hanrahan asked Defendant how she believed Victim had been injured, Defendant said she believed Victim had climbed onto the railing of her crib, and the railing had given way. Hanrahan was concerned "that the story of falling from a crib didn't match the gravity of the injuries that the child had suffered." Hanrahan and other officers investigated Defendant's apartment and examined Victim's crib. The railing was hanging loose from the headboard and footboard. The top railing was "obviously removed from the frame." There was no cracking or damage to the rail. While disassembling the crib, the investigators discovered that one of the bottom slats in the crib was partially broken. Hanrahan testified that he "was concerned that if a child were thrown into that bed hard enough to break a slat underneath the baby bed mattress, that that could be our mechanism of injury."

While investigators were at the apartment complex, Defendant was searching the internet on a computer. She told Hanrahan about a crib recall, and printed it at his request. Hanrahan testified that the recall was directed at risks involving crib mattresses and bumpers and was not relevant to the railing being disconnected.

Following the investigation at the residence, Defendant was interviewed by Hanrahan a second time on April 7. Defendant was agitated. When asked if Alford had hurt Victim, Defendant "became angry" and responded, "[Alford] loves that baby. [Alford] would never hurt that baby." Defendant also stated that Alford was "a good man." The interview ended with Defendant screaming, yelling and cursing. Later, Defendant told

Hanrahan that "she had lied about [Alford], that he is actually very violent[,]" but that "he still wouldn't hurt [Victim], he loved [Victim]."

Stephen Meyer (Meyer), a computer forensic investigator, also testified. Meyer had examined the temporary internet folders and internet history stored on the computer in Defendant's residence between 7:30 p.m. on April 5, to just after midnight on April 7. Defendant's email inbox had been accessed on the computer. On April 5, between 7:30 p.m. and midnight, pornographic material was accessed. Subsequently, between 2 and 3 a.m. on April 6, internet searches were conducted for "www.seizures.net," "babyshakensyndrome.com," and "shaken baby syndron [sic]." Between 10 and 10:45 a.m. that day, additional searches were conducted for "homemade remedies for broken shoulders," "broken shoulders," "how to spot a broken bone," "first aid for broken bones," "child concussion," and "symptoms of neck injury." At about 11 a.m., a search was conducted for "St. Louis obituary" and birth certificates. At approximately 4 p.m. on April 6, a social networking site called "hotornot.com" was accessed, and the viewer looked at pictures predominantly of males. At approximately 6:30 p.m. on April 6, additional pornographic material was accessed. Just prior to midnight on April 6, a search was conducted for "recalls on Graco baby products."

At the time of trial, Victim was twelve years old. As a result of her injuries, Victim required total care. Victim was blind, incontinent, developmentally delayed, unable to feed herself, and unable to walk. She could not be left unattended. She suffered from daily seizures and painful muscle contractions, and had to undergo a hip replacement. There was also testimony that, in the time since Victim's injuries, Defendant married Alford and had three children with him.

11

In Point 1, Defendant contends the State's evidence was insufficient to prove beyond a reasonable doubt that she "participated in any elements of the crime of assault in the first degree because the evidence only placed her at the scene of the crime." We disagree.

Defendant was found guilty of assault in the first degree. *See* § 565.050. A person commits this crime if she "attempts to kill or knowingly causes or attempts to cause serious physical injury to another person." § 565.050.1. The charge against Defendant was submitted to the jury on a theory of accomplice liability. *See* § 562.041.1. The underlying premise for this statutory form of criminal liability is that all persons who act in concert to commit a crime are equally guilty. *See **State v. Meuir***, 138 S.W.3d 137, 143 (Mo. App. 2004). "Missouri eliminated the distinction between principals and accessories in 1979, and it is now the law that all persons who act in concert are equally guilty." ***State v. Barnum***, 14 S.W.3d 587, 591 (Mo. banc 2000); *see **State v. Turrentine***, 524 S.W.3d 55, 60 (Mo. App. 2016). Pursuant to an accomplice liability theory, a person is "criminally responsible" for the conduct of another when "[e]ither before or during the commission of an offense with the purpose of promoting the commission of an offense, he aids or agrees to aid or attempts to aid such other person in planning, committing or attempting to commit the offense." § 562.041.1(2). Thus, "[a]n accomplice is one who, before or during the commission of a crime, intentionally and knowingly aids or encourages the commission of a crime[.]" ***Meuir***, 138 S.W.3d at 143.

The evidence need not directly place the defendant in the act of committing the crime. ***State v. Carter***, 849 S.W.2d 624, 627 (Mo. App. 1993). Any evidence, either direct or circumstantial, that shows "affirmative participation" in aiding the principal to commit

12

the crime is sufficient to support a conviction. *State v. Puckett*, 611 S.W.2d 242, 245 (Mo. App. 1980); *see also State v. Parsons*, 152 S.W.3d 898, 903 (Mo. App. 2005); *Meuir*, 138 S.W.3d at 143. Moreover, the requirement of affirmative participation may be satisfied by inference. *See Carter*, 849 S.W.2d at 627.

> An accused's affirmative participation in an offense may be reasonably inferred from: his presence at the scene of the offense; his association with others involved before, during, and after the offense; his conduct before the offense; his conduct during the offense, including making no effort to assist the victims; and his conduct after the offense, including fleeing from the scene and failing to talk to the police relatively soon after the incident.

*In re Interest of S.B.A.*, 530 S.W.3d 615, 625 (Mo. App. 2017); *see also State v. Rainey*, 545 S.W.3d 916, 924 (Mo. App. 2018); *Turrentine*, 524 S.W.3d at 60; *Meuir*, 138 S.W.3d at 143. Presence at the scene can give rise to an inference of affirmative participation when combined with other circumstances connecting the defendant to the crime. *State v. Dixson*, 546 S.W.3d 615, 619 (Mo. App. 2018); *S.B.A.*, 530 S.W.3d at 625.

In the case at bar, we conclude that the evidence adduced at trial was sufficient to sustain Defendant's conviction for first-degree assault under a theory of accomplice liability. Based upon our review of the record, the State introduced ample evidence, apart from Defendant's mere presence at the scene of the crime, which tended to prove that she affirmatively participated in assaulting Victim.

In evaluating Defendant's guilt, a jury could consider Defendant's behavior before the incident. *S.B.A.*, 530 S.W.3d at 625. Neighbors testified that, in the months leading up to the assault on Victim, alarming sounds, including "bloodcurdling" screams, emanated from Defendant's apartment. Additionally, Victim had previously suffered serious physical injury while in Defendant's care, and Defendant failed to abide by the safety plan

from the Children's Division informing Defendant of the importance of prompt medical attention.

The jurors could have drawn numerous inferences supporting Defendant's guilt from the circumstances surrounding Victim's injuries. Defendant admitted that she stayed with Victim all day and night on April 5, until allegedly discovering Victim's injuries on the afternoon of April 6. Defendant additionally admitted that she and Alford were the only people present in the apartment at the time of the incident. Defendant was "standoffish" at her door on the morning of April 6, and was hesitant to call 9-1-1. Although Defendant had previously been reprimanded for failing to seek medical attention for Victim, Defendant did not call 9-1-1 until Bundy advised Defendant that it would be in her interest to do so. "An attempt by a defendant to cover up his or her involvement is a factor that may, in conjunction with other evidence, support the inference of affirmative participation by an accomplice." *State v. Smith*, 108 S.W.3d 714, 721 (Mo. App. 2003); *see also Parsons*, 152 S.W.3d at 905.

The jurors could also draw inferences supporting Defendant's guilt from her behavior towards doctors and investigating authorities on and after the day of the incident. Defendant's account of the occurrences on April 6 changed during the various interviews. Both Dr. Donaruma and Hanrahan noted Defendant's unusual behavior during interviews, such as not asking questions about Victim, appearing unconcerned, and attempting to deflect questions about Victim's injuries. The jurors' verdict is supported by the reasonable inference that Defendant's behavior evinced a desire to conceal her role in the offense and, thereby, demonstrated consciousness of guilt.

The State also presented evidence that Defendant's proffered explanation for Victim's injuries was unconvincing and false. The jurors reasonably could have inferred that Defendant's story – about Victim falling from her crib – was developed after the fact and did not comport with the type and severity of injuries that Victim suffered. The recall that Defendant mentioned to Hanrahan as an attempted explanation for Victim's injuries bore no relation to the condition of the crib, as observed by police. Moreover, the crib exhibited additional damage, which could have partially explained Victim's injuries through an assault by Defendant. "Exculpatory statements, when proven false, evidence a consciousness of guilt[.]" *State v. Rodden*, 728 S.W.2d 212, 219 (Mo. banc 1987); *State v. Buchli*, 152 S.W.3d 289, 297 (Mo. App. 2004). Additionally, "[g]uilt may be inferred when an accused attempts to deceive the police, as in making a false exculpatory statement." *State v. Hibbert*, 14 S.W.3d 249, 253 (Mo. App. 2000).

A juror also could consider the fact that Defendant continued to associate with Alford following Victim's injuries. Even though Defendant and Alford were the only people present in the apartment when Victim suffered severe, life-altering injuries, and Defendant admitted that Alford is "very violent[,]" Defendant ended up marrying Alford and having three children with him. Companionship before and after an offense is a circumstance from which one's participation in a crime may be inferred. *S.B.A.*, 530 S.W.3d at 625; *Parsons*, 152 S.W.3d at 905.

When reviewing the sufficiency of the evidence to support a criminal conviction, we give great deference to the trier of fact. *State v. Chaney*, 967 S.W.2d 47, 52 (Mo. banc 1998). We are not to act as a "'super juror' with veto powers" over the fact-finder. *State v. Grim*, 854 S.W.2d 403, 414 (Mo. banc 1993). Here, the jury chose not to believe

Defendant's story. Although isolated facts viewed individually, such as Defendant's presence at the scene, may not be sufficient by themselves to support the verdict, "a conviction may rest upon accumulated, interdependent facts, no one of which alone may create more than a suspicion of guilt." *State v. Jackson*, 519 S.W.2d 551, 557 (Mo. App. 1975); *see Parsons*, 152 S.W.3d at 905; *State v. Plant*, 694 S.W.2d 751, 755 (Mo. App. 1985). As previously explained, the evidence establishes considerably more than mere presence by Defendant at the scene of the crime.

In sum, the jurors reasonably could have inferred that Defendant aided or acted together with Alford to assault Victim based on, *inter alia*, the following evidence: (1) Defendant's admission that she and Alford were the only people present at the scene during the time the crime occurred; (2) Defendant's association with Alford before, during, and long after the commission of the crime; (3) Defendant's statements to investigators that Alford did not commit the crime; (4) the incriminating internet searches found on the computer in Defendant's residence, in close proximity to the time her email was accessed; and (5) Defendant's attempt to conceal her involvement in the crime by changing her story multiple times and by providing an unconvincing theory as to how the injury occurred. Here, our review of the record demonstrates that the "totality of the circumstances" provides sufficient evidence of Defendant's guilt. *See State v. Shockley*, 98 S.W.3d 885, 890 (Mo. App. 2003). Thus, we conclude that the State presented sufficient evidence from which the jury could find, beyond a reasonable doubt, that Defendant affirmatively participated in assaulting Victim to support a finding of guilt based on an accomplice liability theory. Point 1 is denied.

*Point 2*

Defendant's second point contends the trial court plainly erred in failing to *sua sponte* declare a mistrial or issue a curative instruction following an alleged misstatement of law made by the prosecutor during the rebuttal portion of closing argument. The following additional facts are relevant to this point.

Instruction No. 5 addressed the issue of accomplice liability. This instruction stated:

> A person is responsible for her own conduct and she is also responsible for the conduct of another person in committing an offense if she acts with the other person with the common purpose of committing that offense or if, for the purpose of committing that offense, she aids or encourages the other person in committing it.

Instruction No. 7 was the verdict-directing instruction for first-degree assault.[5] This instruction stated, in relevant part:

> If you find and believe from the evidence beyond a reasonable doubt:
>
> First, that on or about April 6, 2006, in the County of Phelps, State of Missouri, the defendant or [Alford] attempted to cause serious physical injury to [Victim] by striking her, and
>
> Second, that the defendant or [Alford] in the course of such conduct caused serious physical injury to [Victim],
>
> then you are instructed that the offense of Assault in the First Degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:
>
> Third, that with the purpose of promoting or furthering the commission of that assault in the first degree, the defendant acted together with or aided [Alford] in committing the offense,
>
> then you will find the defendant guilty of Assault in the First Degree.

---

[5] The jury also was instructed on assault in the second and third degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

The jurors also were given Instruction No. 12. In relevant part, it stated that the attorneys' arguments were not evidence and that it was the duty of the jurors "to be governed in your deliberations by the evidence as you remember it, the reasonable inferences which you believe should be drawn therefrom, and the law as given in these instructions."

During the initial portion of the State's closing argument, the prosecutor told the jurors the evidence demonstrated that either: (1) Defendant acted alone to hurt Victim by beating her; or (2) Defendant and Alford acted together to hurt Victim. The prosecutor then stated:

> No one wants to believe it. No one wants to think that a mother would do that to her child. No one wants to think that a mother would hurt her child and leave her for hours and hours and hours, dying. No one wants to believe that a mother would help her boyfriend, even if she didn't do it herself. No one wants to believe that a mother would help her boyfriend do that to a child.
>
> But the evidence in this case is so clear, ladies and gentlemen, that's exactly what she did. That's exactly what she did. She and [Alford] beat [Victim] so badly that this is what she is left with.

In arguing the law of accomplice liability, the prosecutor then continued:

> You can infer lots of things from these facts, ladies and gentlemen. You have to find one of the two of them or both of them did this and that they acted together or aided each other.
>
> How do we know they aided? We can also infer lots of things from what happened after, about why they were aiding each other. She lies. She lies and she lies and she lies and she lies. If you didn't do anything, if you didn't play any role, if you weren't helping in this, why do you lie over and over and over and over again?
>
> ….

And we know that they were acting together because of how they behaved after the fact. She lied. She covered it up. She married him. And she had more children with him.

During Defendant's closing argument, defense counsel also addressed the accomplice liability issue:

They want you to say that because she didn't get help for [Victim] that that's evidence that during the time this offense occurred she was aiding and encouraging [Alford] in committing it.

….

You heard a lot of evidence that [Defendant] didn't get her any help the next day. Be clear that that is not what she is charged with. She is not charged with not getting her help.

During the rebuttal portion of the State's closing argument, the prosecutor offered the following response to defense counsel's argument:

[I]f [Alford] did it and she watched him do it and she didn't stop him, that's something you get to consider in whether she was aiding him, whether she was helping him. That's something you get to consider. *If she is there and she is watching it happen and she is not stopping it, she is not intervening it, she is not calling 9-1-1, that's helping [Alford] do it. That's furthering the commission of the crime*.

(Emphasis added.) There was no objection to the italicized argument, and Defendant's motion for new trial did not include this issue.

In Point 2, Defendant contends the trial court plainly erred during the rebuttal portion of the State's closing argument because the prosecutor's comment misstated the law of accomplice liability, and the trial court was required to *sua sponte* declare a mistrial or issue a curative instruction. Defendant acknowledges the lack of preservation and requests plain error review.

19

Rule 30.20 provides, in pertinent part, that "plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." *Id*. "A claim of plain error places a much greater burden on a defendant than an assertion of prejudicial error." *State v. Wright*, 216 S.W.3d 196, 199 (Mo. App. 2007). Plain error and prejudicial error are not synonymous terms, and mere allegations of error and prejudice will not suffice. *Id*. "Plain error must be evident, obvious, and clear." *State v. Walter*, 479 S.W.3d 118, 131 (Mo. banc 2016). Defendant bears the burden of establishing that the trial court committed an evident, obvious and clear error. *See State v. Thurman*, 272 S.W.3d 489, 498 (Mo. App. 2008). Defendant also bears the burden of proving the existence of a manifest injustice or a miscarriage of justice. *State v. Stanley*, 124 S.W.3d 70, 77 (Mo. App. 2004). According to Defendant, the trial court's failure to *sua sponte* declare a mistrial or give a curative instruction was plain error resulting in manifest injustice. We disagree.

"The declaration of a mistrial is a drastic remedy that will only be granted in extraordinary circumstances in which it is the only way to remove prejudice to the defendant." *State v. Hatch*, 54 S.W.3d 623, 630 (Mo. App. 2001). The trial court is in the best position to assess the prejudicial effect of the prosecutor's statements. *State v. McLarty*, 327 S.W.3d 557, 570 (Mo. App. 2010). Further, a "defendant's failure to object to an improper argument is often strategic, and uninvited intervention may emphasize the matter in a way the defendant chose not to." *State v. Carter*, 415 S.W.3d 685, 691 (Mo. banc 2013); *see State v. Hall*, 319 S.W.3d 519, 523 (Mo. App. 2010) (failure to "properly object to closing argument at the time it is made to a jury results in a waiver of any right to complain of the argument on appeal" and plain error review "is discouraged because the

20

trial court's options are narrowed to uninvited interference with summation"). Furthermore, double jeopardy may bar retrial if the judge in a criminal case grants a mistrial without the defendant's request or consent. *State v. Lovell*, 414 S.W.3d 577, 579 n.4 (Mo. App. 2013). For all of these reasons, "[a] conviction will be reversed based on plain error in closing argument only when it is established that the argument had a *decisive effect* on the outcome of the trial and amounts to manifest injustice." *State v. Edwards*, 116 S.W.3d 511, 536-37 (Mo. banc 2003) (emphasis added); *State v. Walter*, 479 S.W.3d 118, 124 (Mo. banc 2016). Such an effect is demonstrated where there is a reasonable probability the verdict would have been different in the absence of the argument. *State v. Chism*, 252 S.W.3d 178, 186 (Mo. App. 2008). "Usually, misstatements of the law are not deemed reversible error when the proper law is given to the jury because we assume the jury followed the law as stated in the instructions." *Id*. "In reviewing closing arguments, this Court examines the context of the argument made in light of the entire record." *Walter*, 479 S.W.3d at 124.

The prosecutor did not misstate the law. We do not agree with Defendant's interpretation of the prosecutor's comment. Defendant contends that the challenged comment was a "blatant" misstatement of the law because it "left the jury with the understanding that they could convict [Defendant] of assault based solely on the fact that the evidence established she was present at the scene of the crime and did not intervene." Viewing the challenged statement in the context of the entire record, including the prosecutor's closing argument as a whole, it is evident that the prosecutor was not arguing that Defendant's mere presence and failure to intervene were sufficient to prove assault under an accomplice liability theory. Rather, the prosecutor correctly argued that

21

Defendant's actions during the time of the offense and after, including her presence at the scene, attempts to conceal the incident, failure to aid Victim, and continued association with Alford, could be considered as circumstantial evidence from which jurors could infer that Defendant acted together with Alford to commit the offense. *See* **S.B.A.**, 530 S.W.3d at 625 (affirmative participation may be inferred from "conduct during the offense, including making no effort to assist the victims"); *see also* **Parsons**, 152 S.W.3d at 903; **Meuir**, 138 S.W.3d at 143. It was permissible for the prosecutor to emphasize Defendant's presence at the scene and failure to promptly aid Victim to support the State's theory that the totality of the evidence demonstrated Defendant, acting either alone or together with Alford, assaulted Victim by beating or repeatedly striking her. "A prosecutor is allowed to argue the evidence and all reasonable inferences from the evidence during closing arguments." **State v. Brown**, 337 S.W.3d 12, 14 (Mo. banc 2011); *see* **Hall**, 319 S.W.3d at 522-23 ("the permissible field of argument is broad, and so long as counsel does not go beyond the evidence and issues drawn by the instructions or urge prejudicial matters … he is permitted wide latitude in his comments"). Here, the prosecutor properly argued the evidence to discredit Defendant's story that Victim fell from her crib, and to counter the defense theory that Defendant was present in the apartment with Alford, but was somehow unaware of his assault on Victim.

Furthermore, the prosecutor made the challenged comments during her rebuttal to Defendant's closing argument, after defense counsel argued, "[s]he is not charged with not getting [Victim] help." The State was responding to Defendant's argument by highlighting that Defendant's actions after the offense could be considered as evidence of affirmative participation in the assault. The court did not commit error, plain or otherwise, in allowing

22

the argument. *See State v. Howell*, 441 S.W.3d 217, 219 (Mo. App. 2014) ("prosecutor is given even more latitude when responding to issues raised in the defendant's closing argument"); *Hall*, 319 S.W.3d at 523-24 (when reviewing complained-of comments made in rebuttal, the trial court may consider whether the State's comments were invited and the State may go further "in answering the argument of the defendant than would be normally allowed [and] has considerable leeway to make retaliatory arguments at closing … even if comment would be improper").

Finally, even assuming *arguendo* that the prosecutor's comments were improper, our decision would not change. Defendant has failed to demonstrate the alleged misstatement had a decisive effect on the outcome of the trial (i.e., in the absence of the statement, there is a reasonable probability the verdict would have been different). *See Walter*, 479 S.W.3d at 124; *State v. Smith*, 422 S.W.3d 411, 417 (Mo. App. 2013); *Chism*, 252 S.W.3d at 186. As discussed above in Point 1, a jury could reasonably conclude that the evidence did not simply place Defendant at the scene of the crime; the evidence was sufficient to demonstrate that Defendant acted together with Alford to assault Victim. Moreover, manifest injustice or a miscarriage of justice generally will not be found if counsel misstates the law in closing argument but the circuit court properly instructs the jury. *Peterson v. Progressive Contractors, Inc.*, 399 S.W.3d 850, 861 (Mo. App. 2013). As noted previously, the jury was properly instructed: (1) on the principles of accomplice liability; and (2) that the arguments of the attorneys were not evidence. "The jury is presumed to follow the trial court's instructions." *State v. McFadden*, 391 S.W.3d 408, 424 (Mo. banc 2013); *see Chism*, 252 S.W.3d at 186. There is no indication in this case that the jurors did not follow the court's instructions. *See McFadden*, 391 S.W.3d at 421.

Accordingly, the trial court did not plainly err by failing to *sua sponte* declare a mistrial or issue a curative instruction concerning the challenged comments.  Point 2 is denied.

The judgment of the trial court is affirmed.


JEFFREY W. BATES, J. – OPINION AUTHOR

DANIEL E. SCOTT, J. – CONCUR

WILLIAM W. FRANCIS, JR., P.J. – CONCUR