

# Missouri Court of Appeals
## Southern District

### In Division

STATE OF MISSOURI, )
)
    Plaintiff-Respondent, )
)
v. ) No. SD37195
) Filed: September 7, 2022
SAMANTHA RENEE DILLBECK, )
)
    Defendant-Appellant. )

### APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

Honorable Calvin Holden, Circuit Judge

**AFFIRMED**

Following a bench trial, Samantha Dillbeck (Defendant) appeals from her conviction of the class B felony of abuse of a child. *See* § 568.060.[1] Presenting one point on appeal, Defendant challenges the sufficiency of the evidence to support her conviction. Finding no merit in her point, we affirm.[2]

---

[1] All statutory references are to RSMo (2016). All rule references are to Missouri Court Rules (2021).

[2] Defendant was also convicted of operating a child-care facility without a license, for which she was fined $250. *See* § 210.211. Defendant does not challenge that conviction on appeal.

**Factual and Procedural Background**

Defendant was charged with abuse of a child for events occurring in March 2017. After Defendant waived her right to a jury trial, the matter was tried to the court beginning in March 2021. In a court-tried criminal case, the judge's findings have the force and effect of a jury verdict. Rule 27.01(b); *State v. Crawford*, 68 S.W.3d 406, 408 (Mo. banc 2002). In reviewing for sufficiency of the evidence, our review is on the merits, regardless of whether that issue was raised at trial. *State v. Claycomb*, 470 S.W.3d 358, 361-62 (Mo. banc 2015). An appellate court considers all evidence in the light most favorable to the court's decision and grants the State all reasonable inferences. *State v. Lammers*, 479 S.W.3d 624, 632 (Mo. banc 2016). Contrary evidence and inferences are disregarded. *Id*. We defer to the fact-finder's "superior position to weigh and value the evidence, determine the witnesses' credibility and resolve any inconsistencies in their testimony." *State v. Lopez-McCurdy*, 266 S.W.3d 874, 876 (Mo. App. 2008). Viewed from this perspective, the following evidence was adduced at trial.

Defendant ran an unlicensed, in-home daycare facility in 2016 and 2017. One of the five or six children placed in her care was G.B. (Victim), who was born in July 2016. Victim started attending Defendant's daycare in October 2016, when he was approximately three months old.

Victim was a happy, healthy child until December 2016, when he was diagnosed and treated for strep throat. Then in January 2017, Victim began projectile vomiting every morning. Victim's mother (Mother) was very concerned and took Victim to see his pediatrician "very frequently" between December 2016 and March 2017 because of the vomiting issue. She was advised that Victim had a virus and to keep him hydrated with Pedialyte.

On March 10, 2017, Victim vomited when Mother picked him up from daycare. Mother took him to urgent care, where he was diagnosed with acid reflux and prescribed medication.

March 10th was the Friday before spring break, and Mother, a schoolteacher, kept Victim home with her the following week. Victim was not in Defendant's care during that time, and his vomiting resolved that week, although he had a cough and a fever. When spring break ended, Victim went back into Defendant's care.

March 21, 2017, was the second day after spring break. Mother dropped Victim off at Defendant's house and went to work as usual. Victim was "normal" that morning, and Mother had no concerns about his health. A photo taken on Defendant's phone showed Victim awake and alert at 2:54 p.m.

Around 3 p.m. that day, Defendant called Mother. Mother did not answer because she was in a faculty meeting, but instead sent Defendant a text asking if everything was okay. Defendant responded, "No." Mother then called Defendant, who said that Victim was "having problems breathing." Mother asked if Defendant had called 911, and when Defendant said she had not, Mother directed her to call 911.

Mother ended the call and hurried to leave school. In the process, she ran into the school nurse and asked her to come along. They both drove the short distance to Defendant's house, and the nurse took over the 911 call and started providing emergency care to Victim.

When Mother entered Defendant's home, she saw Victim lying on his back on the floor, unresponsive. Paramedics arrived and took Mother and Victim in an ambulance to the hospital. Once there, Victim was taken to the trauma room.

Police also responded to the 911 call. An officer spoke to Defendant, who said that Victim had been in her care all day, had acted normally, and had had a good day. Defendant stated that Victim was sitting on the living room floor playing with another child when his eyes suddenly rolled back in his head. He fell over, hitting his head on the floor, which was both carpeted and covered by an area rug. Defendant was the only adult present when Victim was injured.

Victim stayed in the hospital for seven days and experienced seizures while there, although he had no prior history of seizures. By the end of the hospital stay, Victim was still completely blind in one eye and partially blind in the other. Victim was no longer vomiting, however, and he ultimately made a full recovery. He was never again in Defendant's care.

The State presented three expert pediatric physicians to testify about Victim's injuries and the mechanism that caused them. The three experts who testified were: Dr. Diane Lipscomb, Dr. Mark Cascairo, and Dr. Jennifer Hansen. Each provided the following testimony.

*Dr. Lipscomb*

Dr. Lipscomb, a pediatric and pediatric-critical-care physician, treated Victim at Mercy Hospital. According to Dr. Lipscomb, Victim's clinical presentation at the hospital was of an "acute event" necessitating emergency services. He also had a low heart rate, "agonal" meaning "irregular and ineffective" respirations, and was not crying or acting normally. Victim also had seizures while at the hospital.

Victim was referred as a "trauma alert" because the history indicated that he had suffered a "fall of some sort." Physicians performed x-rays; blood work; CT scans of Victim's brain, chest, and abdomen; and an MRI of his brain. Victim had no bone fractures,

4

and the scans of his chest, lungs, heart, and abdomen were unremarkable. His bloodwork was normal, indicating that he did not have any bleeding abnormalities or blood conditions that could have caused his symptoms.

The scan of Victim's brain, however, showed areas of "acute and subacute bleeding[,]" which Dr. Lipscomb referred to as subdural hemorrhages, meaning bleeding beneath the dura layer that surrounds the brain. Dr. Lipscomb identified subacute bleeding in Victim's brain scans as evidence of prior brain bleeds.

Victim also had retinal hemorrhages, or bleeding within the retinas, in both eyes. The hemorrhages were present in multiple retinal layers.[3]

Dr. Lipscomb testified that Victim's injuries were consistent with "nonaccidental or abusive head trauma." Further, his "life-threatening presentation" was inconsistent with the report that Victim had fallen backward from a seated position onto a carpeted surface. The doctor explained that abusive or nonaccidental head trauma can occur when an adult vigorously shakes an infant, causing the head to go back and forth. This disrupts the blood vessels around the brain, resulting in subdural hemorrhaging and potentially other patterns of bleeding. The force of acceleration determines the severity of the injury.

Dr. Lipscomb based her conclusion that Victim had suffered a "shaking" or "acceleration-deceleration" incident on Victim's injuries, including the macular fold and retinal hemorrhaging observed in his eyes, the subdural hematomas, and his overall clinical presentation. She did not suspect that an impact caused his injuries because there were no skull fractures or epidural hematomas, which are generally associated with impact injuries. Victim also had retinal hemorrhaging, which was extremely unlikely to result from impact

_____

[3] These retinal hemorrhages were discussed in more detail, *infra*, by the treating pediatric ophthalmologist, Dr. Cascairo.

5

only.  Dr. Lipscomb thus found it "extremely unlikely" that Victim's injuries were caused from falling over backwards from a seated position.  She opined that a large head or a flat head would not change that conclusion.

Dr. Lipscomb further testified that if Victim was awake and alert at 2:54 p.m. on the day in question, then she would suspect that something happened between that time and the 911 call.  Victim's injuries were not the kind in which there could be a "lucid window" before he became "altered."

*Dr. Cascairo*

Dr. Cascairo, a pediatric ophthalmologist, also treated Victim.  The doctor was consulted to determine if nonaccidental trauma could be ruled out as the cause of Victim's condition.  Reports indicated that Victim had fallen, but there were "a couple of different versions of the history of what happened."  He identified Victim's symptoms as difficulty breathing, possible seizure activity, a need for resuscitation en route to the hospital, and the presence of subdural hemorrhaging without any external sign of trauma.

According to Dr. Cascairo, Victim had retinal hemorrhages characteristic of many nonaccidental trauma cases, meaning they "involved multiple layers" of the retinal tissue, and were varied in shape, size, and location.  The hemorrhages in Victim's left eye were more superficial and "moderate[,]" but those observed in the right eye were "severe" and covered the retina.  This meant that Victim could not see from that eye until the hemorrhages cleared.  In addition to multiple hemorrhages, Victim's right eye also showed a "macular fold" – a portion of the retina that was folded rather than smooth and flat. Macular folds are caused by "traction," or a pulling force of some kind, which could be caused by surgeries, trauma, scarring, and infections.

6

Dr. Cascairo testified that the presence of a macular fold in Victim's retina was significant because there were no external signs or history of significant trauma. A finding of retinal hemorrhages in conjunction with a macular fold is "pathognomonic for a shaken baby because there's nothing else under these circumstances that could cause that kind of traction to create a fold in the macula." In other words, the presence of a macular fold "makes it almost a sure thing that this was – this was a nonaccidental trauma that resulted from shaking" under the circumstances in this case.

Dr. Cascairo further testified that falling backward on a carpeted surface was not consistent with Victim's condition because he does not see retinal hemorrhages or macular folds in children who have fallen, even when the fall is from a significant height. That impact alone does not cause the injuries Victim experienced, which require "acceleration-deceleration[.]"

Dr. Cascairo finally noted the presence of retinal hemorrhaging in Victim's eyes that appeared "somewhat faded[,]" which might have indicated an older injury. This did not change his opinion regarding the mechanism of Victim's injuries, but if anything, it heightened the suspicion for nonaccidental trauma because it likely "represents a pattern of treatment of the child as opposed to just one instance."

*Dr. Hansen*

Dr. Hansen, a child-abuse pediatrician at Children's Mercy Hospital in Kansas City, consulted on Victim's case at the request of the Children's Division. After reviewing Victim's hospital records, as well as earlier records from his primary care physician and

urgent care visits, Dr. Hansen concluded that the totality of his presentation and symptoms were "consistent with abusive head trauma."[4]

Dr. Hansen noted that Victim was reportedly doing well and interacting normally on the day of the incident until 3 p.m., when he became unresponsive and reportedly fell backwards from a seated position on the floor. Victim's presentation at the hospital included agonal respirations, seizure activity, and abnormal responsiveness. During the hospitalization, he continued to have seizure concerns, and imaging identified bilateral subdural hemorrhages, bilateral retinal hemorrhages, and a retinal fold in his right eye. A subdural hemorrhage has many causes, but the most common cause in infants is "significant trauma." Consequently, the fact that Victim had these hemorrhages with "only varying minimal or minor trauma reported raised concerns for abuse."

Dr. Hansen similarly testified that, although retinal hemorrhages may have many causes, the distribution, severity, and pattern of retinal hemorrhaging in Victim, an eight-month-old baby, who was otherwise medically healthy, was "very specific for abusive head trauma." The macular fold is "essentially specific for abusive head trauma and is really only reported in the literature as occurring in abusive head trauma and in severe fatal head injuries in children."

Dr. Hansen opined that Victim's reported history of falling from a seated position onto a carpeted surface was not consistent with his injuries because such a low-level fall would not "generate enough force to result in a significant injury to the brain or bleeding around the surface of the brain or to the eyes." Instead, the combination of symptoms

---

[4] Dr. Hansen explained that what was once referred to as "shaken baby syndrome" is now called "abusive head trauma[.]" The medical community determined that the term shaken baby syndrome was "too specific and was not inclusive enough of all injury mechanisms" of abuse. Shaken baby syndrome remains a subset of abusive head trauma, which is the more general term.

Victim exhibited, including the breathing difficulties, retinal hemorrhages, seizures, and subdural hemorrhages, "results in a likelihood ratio for abuse of essentially a hundred percent."

Like Drs. Lipscomb and Cascairo, Dr. Hansen noted the possibility that Victim may have suffered prior injuries. The MRI scans of the subdural hemorrhaging led her to believe that something happened to Victim at least two or three weeks before the March 21, 2017 incident. However, the doctor opined that there was "absolutely" a separate, acute event on March 21st because Victim's normal behavior on that day up until he suddenly became unresponsive was not consistent with a weeks-old injury. Nor would "rebleeding" of a prior injury result in Victim's condition, because rebleeding of subdural hemorrhages usually involves a very small volume of blood, generally would not produce any symptoms, and "certainly [would not] cause a child [to have] severe neurologic collapse," like Victim had. Rather, Victim's presentation was consistent with a severe injury that happened very close in time to him becoming symptomatic. Further, nothing would suggest that Victim had a "delayed presentation or lucid interval" from past injuries. Victim's brain injuries would have had to have been inflicted within "minutes" of the 911 call, as she would not have expected Victim to behave normally for any amount of time after the injuries occurred.

In sum, Dr. Hansen testified that the "combination" of the specific symptoms Victim had, as well as those he did not have, resulted in the conclusion that "abusive head trauma" was the "only possibility" as the cause of his symptoms.

Defendant testified in her own defense. She called several witnesses, including Victim's pediatrician, and a pediatrician with a forensic pediatric practice. The trial court found Defendant guilty, beyond a reasonable doubt, of abuse of a child and sentenced her

to serve seven years in the Department of Corrections. This appeal followed. Additional facts will be included below as we address Defendant's point on appeal.

## Discussion and Decision

Defendant's single point on appeal challenges the sufficiency of the evidence to support her conviction of abuse of a child. In support of her argument, Defendant relies on expert testimony that she provided. The following facts are relevant to her point.

Defendant called Victim's pediatrician, who testified that Victim's head circumference fell within the 45th percentile in November 2016, and by January 2017, it fell within the 82nd percentile. By July 2017, it was in the 94th percentile. These measurements still fell within the normal range.

Defendant then called Dr. Michael Weinraub, a pediatrician with a forensic pediatric practice, to testify about the cause of Victim's injuries. According to Dr. Weinraub, Victim had a "chronic subdural hematoma[,]" or a collection of old blood and fluid above the brain that was not supposed to be there. This resulted from a brain bleed that occurred in the past, and kept rebleeding and growing, causing Victim's head to expand too much and creating intracranial pressure.

Dr. Weinraub said that Victim also had a flat spot on the right side of the back of his skull. The doctor opined that, if Victim fell and hit that flat part, it would cause a "shockwave" to go through to the other side of the head and cause a larger bleed than would be anticipated with a chronic subdural hematoma alone. Further, Victim was developing "macrocephaly," or a large head, which means he was susceptible to an intracranial hemorrhage with less forceful trauma, such as an "accidental fall."

Dr. Weinraub disagreed with the State's experts that falling backward onto carpet could not have caused Victim's injuries. The way Victim fell – "lunging backwards,

rolling his eyes back, having a seizure, looked like slamming his head if he hit it on the flat part" – could cause an acute subdural hematoma. "Any added fluid" to what was already present in Victim's head "would cause hyperacute increase of intracranial pressure[,]" which in turn would cause retinal hemorrhages and a temporary coma. In his opinion, there are other reasonable explanations for Victim's injuries besides abusive head trauma.

Defendant argues the evidence – entirely circumstantial – was insufficient to support her conviction for abuse of a child. Defendant's single point on appeal contends the trial court erred in finding her guilty of that offense because the evidence: (1) "did not establish that the Victim was in otherwise good health at the time of the injury"; (2) "did not show beyond a reasonable doubt that the Defendant was the cause of injury"; and (3) "did not prove that the evidence was inconsistent with innocence." Applying our standard of review as we must, these arguments lack merit.

"Appellate review of sufficiency of the evidence is limited to whether the State has introduced adequate evidence from which a reasonable finder of fact could have found each element of the crime beyond a reasonable doubt." *State v. Lammers*, 479 S.W.3d 624, 632 (Mo. banc 2016). "This is not an assessment of whether the Court believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt." *State v. Nash*, 339 S.W.3d 500, 509 (Mo. banc 2011) (internal quotation marks omitted); *see State v. Bateman*, 318 S.W.3d 681, 687 (Mo. banc 2010). "Circumstantial rather than direct evidence of a fact is sufficient to support a verdict." *State v. Lehman*, 617 S.W.3d 843, 847 (Mo. banc 2021); *State v. Hilleman*, 634 S.W.3d 709, 713 (Mo. App. 2021). If that evidence supports equally valid inferences, it is up to the fact-finder to determine which

11

inference to believe, as the fact-finder "is permitted to draw such reasonable inferences from the evidence as the evidence will permit[.]" **State v. Hineman**, 14 S.W.3d 924, 927 (Mo. banc 1999); **Lehman**, 617 S.W.3d at 847. This Court does not act as "a 'super juror' with veto powers." **State v. Grim**, 854 S.W.2d 403, 414 (Mo. banc 1993); **State v. Chaney**, 967 S.W.2d 47, 52 (Mo. banc 1998). Instead, we give "great deference to the trier of fact." **Chaney**, 967 S.W.2d at 52.

A person commits the offense of abuse of a child if that person "recklessly causes a child who is less than eighteen years of age to suffer from abusive head trauma." § 568.060.3. "Abusive head trauma" is defined as "serious physical injury to the head or brain caused by any means, including but not limited to shaking, jerking, pushing, pulling, slamming, hitting, or kicking[.]" § 568.060.1(2).[5] Further, a person "acts recklessly" or is reckless when that person "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." § 562.016.4. For the following reasons, we conclude that the evidence was sufficient for the trial court to draw reasonable inferences finding Defendant guilty of abuse of a child beyond a reasonable doubt. *See* § 568.060.3; **Nash**, 339 S.W.3d at 509.

First, the trial court could have drawn reasonable inferences that Victim suffered abusive head trauma from the circumstances surrounding Victim's injuries. *See* **State v. Mueller**, 568 S.W.3d 62, 72 (Mo. App. 2019). Each of the State's experts testified that

---

[5] "Serious physical injury" means "a physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body." § 565.060.1(7). Although the seriousness of Victim's injuries was not significantly disputed at trial, the evidence was sufficient to support the conclusion that Victim sustained "serious physical injury" to the head or brain. He experienced a "life-threatening" event necessitating emergency intervention on March 21, 2017, lost vision for a significant period of time, and suffered seizures while in the hospital.

Victim's injuries were consistent with nonaccidental or abusive head trauma: (1) Dr. Lipscomb concluded that Victim had suffered a "shaking" or "acceleration-deceleration" incident, a subset of abusive head trauma, based on Victim's clinical presentation and injuries, including the subdural hematomas, macular fold, and retinal hemorrhaging; (2) Dr. Cascairo testified that Victim's retinal hemorrhaging was characteristic of many nonaccidental trauma cases, and that the presence of a macular fold under the circumstances of the case made it almost certain that Victim's injuries were caused by "nonaccidental trauma that resulted from shaking"; and (3) Dr. Hansen similarly concluded that the totality of Victim's presentation and symptoms were "consistent with abusive head trauma." This evidence would permit a fact-finder to reasonably infer that Victim suffered abusive head trauma, i.e., "serious physical injury to the head or brain caused by … shaking" – not due to an accidental fall from a seated position on a carpeted floor, as Defendant claimed. *See* § 568.060.1(2).

Further, the evidence would permit a reasonable inference that Defendant was the person who caused Victim to suffer abusive head trauma. Both Drs. Lipscomb and Hansen testified that Victim's injuries must have occurred shortly before the 911 call was made. Defendant was the only person who was present when Victim was injured and who had the opportunity to cause Victim's injuries.

Lastly, there was sufficient evidence to reasonably infer that Defendant "recklessly" caused Victim's injuries. *See* § 562.016.4. The State's experts testified that Victim's injuries were caused by "acceleration-deceleration" force or "shaking." Defendant was an experienced child-care provider, aware that applying such force to an infant could cause serious head or brain injuries to the child. In concluding that Defendant

13

applied such force to Victim, the trial court could also reasonably conclude that she consciously disregarded a substantial and unjustifiable risk of injury to Victim. *See id.*

Thus, sufficient evidence, and reasonable inferences drawn therefrom, support the trial court's decision that found beyond a reasonable doubt that Defendant "recklessly cause[d] a child who is less than eighteen years of age to suffer from abusive head trauma." § 568.060.3. Although we agree with Defendant that this is a largely circumstantial case, it is well settled that "[i]f circumstantial evidence supports equally valid inferences, it is up to the fact-finder to determine which inference to believe." *Hilleman*, 634 S.W.3d at 713; *see Lehman*, 617 S.W.3d at 847. Further, this Court is required to give "great deference to the trier of fact." *Chaney*, 967 S.W.2d at 52.

In arguing that the State presented insufficient evidence to support her conviction, Defendant relies almost exclusively on facts and inferences that are contrary to the court's decision. Defendant particularly emphasizes evidence that Victim may have suffered from prior injuries and poor health before the March 21, 2017 incident.[6] To the extent the evidence of prior injuries and poor health are contrary to the court's decision, the evidence must be disregarded under the applicable standard of review. *Lammers*, 479 S.W.3d at 632; *Nash*, 339 S.W.3d at 509. In addition, Defendant's reliance on Dr. Weinraub's opinions is similarly contrary to our standard of review and therefore unavailing. While it

---

[6] All three State experts observed some indications of prior injury to Victim that actually damaged the defense. As Dr. Cascairo testified, the "somewhat faded" prior retinal hemorrhaging he observed likely represents "a pattern of treatment of the child as opposed to just one instance." Similarly, Dr. Lipscomb also identified evidence of prior brain bleeds in Victim's brain scans. Dr. Hansen explained that acute vomiting, like Victim experienced prior to the March 21st incident, can be a sign of irritation around the brain from repeated episodes of shaking or other abusive head trauma that involves a lesser amount of force causing more repetitive, low-level injuries. All three doctors reaffirmed, however, that Victim's presentation on March 21, 2017, was consistent with a severe injury that happened very close in time to the onset of his symptoms that day.

14

is true that Dr. Weinraub opined that Victim's condition could have been caused by other mechanisms than abusive head trauma, the State's experts all disagreed with that conclusion. The trial court, as fact-finder, was entitled to believe the State's evidence and disbelieve Dr. Weinraub's testimony. *See Lehman*, 617 S.W.3d at 847; *Lopez-McCurdy*, 266 S.W.3d at 876.

We also reject Defendant's argument that the State "did not prove that the evidence was inconsistent with innocence." This argument attempts to resurrect the equally valid inferences rule, which was expressly abolished in *Chaney*. *See State v. Chaney*, 967 S.W.2d 47, 54 (Mo. banc 1998) ("The equally valid inferences rule was effectively abolished by *State v. Grim*."); *State v. Grim*, 854 S.W.2d 403, 408 (Mo. banc 1993) (the circumstantial-evidence rule "should be, and is, rejected").[7] In *Chaney*, our Supreme Court expressly explained that the rule conflicted with an appellate court's standard of review:

> [T]he equally valid inferences rule conflicts with and renders meaningless the requirement that the appellate court presume that the trier of fact drew all reasonable inferences in favor of the verdict. Because the equally valid inferences rule is at war with the due process standard governing an appellate court's review of the sufficiency of evidence, the equally valid inferences rule should no longer be applied.

*Chaney*, 967 S.W.2d at 54 (internal citation omitted); *see also State v. Campbell*, 600 S.W.3d 780, 786-87 (Mo. App. 2020) (similarly observing the equally valid inferences rule was effectively abolished).

*Grim*, *Chaney*, and cases following their analyses demonstrate that Defendant's reliance on the abolished equally valid inferences rule is misplaced. The State was not

---

[7] The circumstantial-evidence rule states: "Where the conviction rests on circumstantial evidence, the facts and circumstances to establish guilt must be consistent with each other, consistent with the guilt of the defendant, and inconsistent with any reasonable theory of his innocence." *Grim*, 854 S.W.2d at 405 (quoting *State v. Pritchett*, 39 S.W.2d 794, 796-97 (Mo. 1931)).

15

required to show that the evidence was inconsistent with Defendant's innocence, nor was it required to affirmatively disprove every other reasonable hypothesis of innocence. *See Chaney*, 967 S.W.2d at 54. Under the applicable standard of review, the question for this Court is "whether, in light of the evidence most favorable to the State, any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt." *Nash*, 339 S.W.3d at 509 (internal quotation marks omitted); *Lehman*, 617 S.W.3d at 847 (this Court asks only whether there was sufficient evidence from which the fact-finder *reasonably* could have found the defendant guilty). As discussed above, that standard was met here. Accordingly, Defendant's point is denied.

The judgment of the trial court is affirmed.


JEFFREY W. BATES, J. – OPINION AUTHOR

MARY W. SHEFFIELD, J. – CONCUR

JENNIFER R. GROWCOCK, J. – CONCUR