

# Missouri Court of Appeals
## Southern District

### En Banc

STATE OF MISSOURI,       )
                         )
    Plaintiff-Respondent,      )
                         )
v.                       )       No. SD37153
                         )
CARL W. DILL, II,        )       **Filed:  July 16, 2024**
                         )
    Defendant-Appellant.      )

APPEAL FROM THE CIRCUIT COURT OF LAWRENCE COUNTY

Honorable David A. Cole

**<u>AFFIRMED</u>**

On October 31, 2023, this court issued a *per curiam* opinion in this cause.  On December 19, 2023, the Supreme Court of Missouri sustained an application for transfer to that Court.  On May 24, 2024, the Supreme Court entered an order retransferring the cause to this court.  The original opinion of this court, which follows, is now readopted and reissued.

PER CURIAM.  Carl W. Dill, II ("Defendant") appeals his convictions following a jury trial in the Circuit Court of Lawrence County for (1) the class-A felony of trafficking in the first degree (Count 1), and (2) the class-E felony of resisting an arrest (Count 2).

In two points relied on, Defendant claims the evidence was insufficient to prove beyond a reasonable doubt that Defendant:  (1) affirmatively participated in a criminal enterprise by countenancing or approving another's actions of possessing and transporting 88

1

grams of methamphetamine; and (2) knew the law enforcement officer "was effecting [Defendant's] arrest prior to fleeing or that [the officer] was making [Defendant]'s arrest for felony possession of a controlled substance." Finding no merit in either claim, we affirm.

## Standard of Review & Governing Law

"Appellate review of sufficiency of the evidence is limited to whether the State has introduced adequate evidence from which a reasonable finder of fact could have found each element of the crime beyond a reasonable doubt." *State v. Mueller*, 568 S.W.3d 62, 66 (Mo. App. S.D. 2019) (quoting *State v. Lammers*, 479 S.W.3d 624, 632 (Mo. banc 2016)). In such a review, we "accept[] as true all the evidence favorable to the verdict, including all favorable inferences properly drawn from the evidence, and disregard[] all evidence and inferences to the contrary." *State v. Cline*, 808 S.W.2d 822, 823 (Mo. banc 1991).

"We do not weigh the evidence. Instead, we defer to the fact-finder's superior position to weigh and value the evidence, determine the witnesses' credibility and resolve any inconsistencies in their testimony." *Mueller*, 568 S.W.3d at 66 (internal quotations and citations omitted). "The State may prove its case by presenting either direct or circumstantial evidence connecting the defendant to each element of the crime. Circumstantial evidence is given the same weight as direct evidence and the jury is free to draw reasonable inferences from the evidence presented." *Id.* (internal citation omitted). Our summary of the relevant evidence is presented in accordance with these standards.

Under the circumstances at issue in this appeal, a person commits the offense of first-degree trafficking in violation of section 579.065[1] if that person:

> knowingly distributes, delivers, manufactures, produces or attempts to
> distribute, deliver, manufacture or produce:

---

[1] Unless otherwise stated, all statutory citations are to RSMo 2016, including, as applicable, statutory changes effective January 1, 2017.

2

. . . .

(8) More than thirty grams but less than ninety grams of any material, compound, mixture, or preparation containing any quantity of . . . methamphetamine[.]

Section 579.065.1(8).

Section 562.012 provides, in pertinent part:

Guilt for an offense may be based upon an attempt to commit an offense if, with the purpose of committing the offense, a person performs any act which is a substantial step towards the commission of the offense. A **"substantial step"** is conduct which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense.

Section 562.012.1.

A person is criminally responsible for the conduct of another when:

. . . .

(2) Either before or during the commission of an offense with the purpose of promoting the commission of an offense, he . . . aids or agrees to aid or attempts to aid such other person in planning, committing or attempting to commit the offense.

Section 562.041.1(2).

A person commits the offense of resisting arrest under section 575.150.1 if, in relevant part, he "knows or reasonably should know that a law enforcement officer is making an arrest . . . , and for the purpose of preventing the officer from effecting the arrest, . . . he . . . [r]esists the arrest . . . by fleeing from such officer[.]" Section 575.150.1(1). Section 575.150.5(1) enhances resisting arrest to a class-E felony "if the State presents sufficient evidence that the defendant resisted an officer's attempt to make an arrest 'because of' or 'on account of' an offense, and the offense constitutes a felony as a matter of law." *State v. Shaw*, 592 S.W.3d 354, 359-60 (Mo. banc 2019).

3

**Evidence and Procedural Background**

At around 1:00 p.m. on June 18, 2019, Jasper County Transportation Deputy David Roughton ("the deputy"[2]) was traveling in a marked Sheriff's van on Highway 96 when he noticed a white truck pulling a trailer that was traveling very fast on the shoulder of the road in the opposite lane. The truck and trailer were kicking up a lot of dust and debris. The deputy was slowing down to try to determine why the truck was going so fast on the shoulder when a blue Chevrolet Cruze ("the Cruze"), coming up from behind him, shot between him and the truck at a "super high rate of speed." He then realized that the truck had moved onto the shoulder to get out of the way of the Cruze, and he slowed down to see what was going to happen with the truck, which he thought was going to crash. When the truck successfully returned to the road, the deputy focused back on the Cruze that had cut between them.

The deputy called 9-1-1 to report a reckless driver, and he sped up to keep the Cruze within eyesight. As the Cruze approached the intersection of Highway 96 and Route UU, it tried to maneuver onto the shoulder, then it suddenly changed direction as if to make a southbound turn onto a gravel road. The driver lost control, and the Cruze went off the roadway into a real deep ditch, landing upside down.[3]

The deputy informed dispatch of the location of the wreck and stopped to check on the occupants in the Cruze, handing his phone to a bystander that he asked to call 9-1-1. The deputy watched the driver, later identified as Douglas Ward ("Ward") of Lebanon, punch out the driver's-side window of the Cruze with his fist and crawl out. The deputy heard other

[2] The deputy initially identified himself at trial as "Corporal" David Roughton. Because he later repeatedly referred to himself as "deputy" throughout his testimony, we use that title here and mean no disrespect if we have incorrectly stated his rank.
[3] The deep depression off the roadway where the Cruze came to rest was described as either a "ditch" or a "ravine[,]" and we use those terms interchangeably.

people in the Cruze. The deputy identified himself as law enforcement, told everyone to relax, and asked if anyone was hurt. The deputy informed them that he had help on the way, and he directed them to "stay down" and not get up and walk around. Ward started to get up, appearing dazed, and the deputy told him to just stay down. At first, Ward was compliant, and he sat and looked up at the deputy.

Meanwhile, two other passengers crawled out of the overturned vehicle. One passenger, Tara Ivy ("Ivy"[4]), was also from Lebanon. Defendant, the other passenger, was from Conway, a town eighteen miles from Lebanon. Again, the deputy told everyone to stay down and told them that an ambulance was on its way. Ward, down in the ditch on the driver's side of the Cruze, was the closest of the three occupants to the deputy. Defendant was on the opposite side of the Cruze, standing at the passenger-side door.

After Ivy crawled out, she started to come around to the front of the overturned car. She then attempted to crawl up the ditch and began screaming, "I'm hurt, I need help, I'm pregnant." The deputy told Ivy to stay down and that the ambulance was on its way, but Ivy was non-compliant. She "was just flipping out" and started to crawl up the ditch toward the deputy. The deputy said, "[N]o lady just stay back, stay down, stay away." The deputy realized that Ivy, who did not appear to be hurt, was trying to distract him from watching Ward. Ivy was not doing anything the deputy would normally expect to see from a car-crash victim.

The deputy turned his attention back to Ward and saw that he was attempting to stand up. Ward then started digging in his pockets. The deputy ordered Ward to stay down and take his hands out of his pockets. The deputy was in fear for his life when Ward ignored his

---

[4] In the record on appeal, the surname for this passenger is most often spelled "Ivy." In two other documents, it is spelled "Ivey." We will use the predominant version in this opinion.

5

directive and kept digging in his pockets while giving the deputy "this stare like a flight or fight."

Due to Ivy's distraction and all the ensuing chaos, the deputy felt that he was losing control of the scene, so he pulled his gun and trained it on Ward, fearing that Ward might be trying to pull a gun out of his pocket. The deputy wanted to "up the ante[,]" maintain control, and "quell whatever this guy was getting ready to pull out of his pockets." The deputy screamed at Ward to keep his hands up where he could see them, keep his hands above his head, and lay down and relax, but Ward did not comply. The deputy was "very focused on him, screaming at him saying stop, you know, don't make me shoot you." During the deputy's exchange with Ward, the deputy observed that Defendant was at the back of the driver's side of the Cruze, but it was hard for him to say whether Defendant was standing or sitting at that time.

At one point, Ivy and Defendant stood up to watch the encounter between the deputy and Ward, then crouched back down when the deputy drew his weapon. As soon as the deputy's attention was back on Ward, Defendant and Ivy stood back up and watched what the deputy was doing with Ward. Defendant and Ivy were watching the encounter when Ward "flipped" from his pocket a large baggie of clear, white, crystalline substance that the deputy believed to be an illegal drug.[5] The bag landed a couple of feet away from Ward by the driver's-side door of the Cruze.

After Ward flipped the "very large bag" out of his pants, the deputy testified that "the tension just kind of went out." The deputy testified:

---

[5] Subsequent laboratory analysis determined that the bag Ward threw on the ground contained approximately 88.01 grams of methamphetamine.

So, I'm like, okay, dude, really.  So, I holstered up.  And I realized he is not digging in his pockets for a gun.  And I pull out the handcuffs and I start to go down the ravine.  I start to approach [Ward].

I told him I am placing you under arrest.  As soon as I literally holster my gun and pulled the handcuffs all of them jumped up.  Ward was on his feet.  I don't know if [Defendant] - he was probably on his feet by that time.  And Ward took off.  He literally just gave flight.

Ward fled eastward down the ditch line, heading directly away from the deputy. Defendant took off southward, running up the hill and going around and behind the deputy. Defendant reached the roadway and continued south past the tree line, at which point the deputy lost sight of him.

The deputy testified, "I was focused on Ward.  I gave chase to Ward."  Ward went through and up the back side of the ditch and fell down.  The deputy was able to catch Ward at that point, and he engaged in fisticuffs with Ward for a while, but the deputy was not able to get a good grasp on Ward.  Ward had fallen onto his back, and he kicked his legs up in a defensive posture.  The deputy was screaming at Ward to "get up, give up, you know, chill out."  The deputy displayed and then struck Ward with a "compliance tool[,]" but Ward did not comply.

During the deputy's encounter with Ward, Ivy came up behind the deputy and tried to grab him.  As she did so, she screamed, "[L]eave him, leave him alone, leave him alone."  She ignored the deputy's directive to stay back, and the deputy "flipped" his compliance tool at Ivy to keep her back.  The maneuver worked, and Ivy retreated.  The interaction with Ivy allowed Ward to put some distance between him and the deputy.  As the deputy turned back to Ward, the deputy lost his footing and fell at the same time that Ward got up.  The deputy rolled down the ditch to give himself some distance from Ward so that Ward would not be on top of him.  The deputy then got up and resumed his pursuit of Ward.

7

Eventually, the deputy fell down again and was just "out of gas." Ward, unpursued, continued to run down Highway 96. Ward unsuccessfully attempted to stop several cars to try and get a ride, and he eventually went and hid under a bridge located three blocks away from the highway intersection. Ivy engaged the deputy again, and he arrested her for obstruction. She -- still fighting the entire time -- was detained, handcuffed, and restrained by the deputy until highway patrol troopers arrived on the scene. At that point, Ivy finally surrendered and was taken into custody.

When Missouri Highway Patrol Trooper Jonathon May ("Trooper May") arrived, the deputy directed him to the bridge where he saw Ward trying to hide. Trooper May found Ward in the grass about two football-field lengths east of the crash site, and he took Ward into custody.

Missouri Highway Patrol Trooper Darren Call ("Trooper Call") was dispatched to look for anyone who was traveling on foot in the vicinity of the crash scene. Trooper Call saw Defendant, wearing wet clothes, walking east on Highway 96 in the Phelps area. Defendant told Trooper Call that his clothing was wet because he swam in a farmer's pond, and he said nothing about having been in a car accident. Trooper Call transported Defendant to the county jail.

Upon arriving at the jail, Trooper Call and Defendant saw Ward handcuffed to a bench. Ward and Defendant looked at each other, and Ward said to Defendant, "[T]hey got you too[.]" Based upon that statement, Trooper Call believed that Defendant and Ward had acknowledged each other in a familiar way that revealed that they knew each other.

8

**Analysis**

*Point 1 – Drug Trafficking via Accomplice Liability*

The jury was instructed that in order to find Defendant guilty under Count 1, it must find beyond a reasonable doubt that: (1) Defendant and Ward transported methamphetamine; (2) such conduct was a substantial step toward the commission of first-degree trafficking by attempting to deliver 30 grams or more of methamphetamine; (3) Defendant and Ward did so in a motor vehicle; (4) Defendant and Ward engaged in this conduct for the purpose of committing first-degree trafficking; and (5) Defendant acted together with Ward in committing first-degree trafficking with the purpose of promoting or furthering its commission. *See* section 562.041.1(2).

Defendant argues that the evidence adduced at trial was insufficient to prove beyond a reasonable doubt that Defendant had affirmatively participated in a criminal enterprise by countenancing or approving another's actions of possessing and transporting 88 grams of methamphetamine as necessary to sustain his conviction on Count 1 for drug trafficking based upon an accomplice liability theory. We disagree.

"Importantly, in order to secure a conviction under accomplice liability, the State must prove the defendant had 'the culpable mental state to have acted with the purpose of promoting the particular underlying offense.'" *State v. Mason*, 616 S.W.3d 345, 348 (Mo. App. E.D. 2020) (quoting *Booker v. State*, 552 S.W.3d 522, 530 (Mo. banc 2018)). "[A]n accomplice is one who, before or during the commission of a crime, intentionally and knowingly aids or encourages the commission of a crime[.]" *Mueller*, 568 S.W.3d at 71 (quoting *State v. Meuir*, 138 S.W.3d 137, 143 (Mo. App. S.D. 2004)).

"The underlying premise for this statutory form of criminal liability is that all persons who act in concert to commit a crime are equally guilty." *Id.* at 71. "The evidence need not directly place the defendant in the act of committing the crime." *Id.* Evidence to support a conviction may be any evidence, either direct or circumstantial, that demonstrates "affirmative participation" in aiding the principal to commit the crime. *Id.* "[T]he requirement of affirmative participation may be satisfied by inference." *Id.*

> Such inferences of the accused's affirmative participation may include
>
> "his presence at the scene of the offense; his association with others involved before, during, and after the offense; his conduct before the offense; his conduct during the offense, including making no effort to assist the victims; and his conduct after the offense, including fleeing from the scene and failing to talk to the police relatively soon after the incident."

*Id.* (quoting *In re S.B.A.*, 530 S.W.3d 615, 625 (Mo. App. E.D. 2017)). Presence, combined with other circumstances connecting the defendant to the crime, can give rise to an inference of affirmative participation. *Id.* at 71-72.

Here, the State introduced evidence from which a reasonable juror could infer Defendant's affirmative participation when his presence at the scene is combined with the other circumstances connecting him to the crime. First, the jury could consider Defendant's behavior before the incident in evaluating Defendant's guilt. Defendant was from Conway, a town relatively close to where Ward lived in Lebanon, but a considerable distance from the scene of the accident. They were riding in the Cruze together, traveling at a "super high rate of speed," "shooting" between the deputy's law enforcement van and a truck pulling a trailer on Highway 96, just before the Cruze ran off the road and overturned.

A reasonable juror could have inferred that Ward, Ivy, and Defendant were engaged in criminal activity due to their high rate of speed and the careless and imprudent way in which

10

they "shot" between a law enforcement vehicle and the truck and trailer. Jurors could also have reasonably drawn an inference that the individuals in the Cruze were traveling together in this fashion to deliver the methamphetamine to someone in the area of the incident as they were not from that area.

In addition to associating himself with the transportation of methamphetamine by accompanying Ward and Ivy in their travel on Highway 96, Defendant continued to act in concert with Ward and Ivy after the crash. Defendant crawled out of the Cruze and started to get up. Defendant, along with Ward and Ivy, simultaneously disobeyed the deputy's commands to stay down. A reasonable juror could infer from such concerted disobedience that Defendant intended to distract the deputy's attention from Ward to allow Ward to surreptitiously dispossess himself of the bag that contained the controlled substance. At no time during the encounter with the deputy did Defendant disassociate himself from Ivy and Ward. Defendant did not wait for the medical help that was on its way, and he did not try to aid the deputy in securing the scene. Instead, Defendant refused to obey the deputy's directives, and when the deputy was distracted by Ward and Ivy, Defendant fled from the scene of the accident.

"Evidence that, after being stopped by a police officer and directed to remain, a defendant fled and hid is admissible evidence tending to prove a consciousness of guilt." *State v. Davidson*, 521 S.W.3d 637, 644 (Mo. App. W.D. 2017) (quoting *State v. Holleran*, 197 S.W.3d 603, 611 (Mo. App. E.D. 2006)).

Further, after Defendant fled, he hid from the police and misled Trooper Call by failing to reveal his presence at the crash scene and by saying that he had instead been swimming in a farmer's pond. "An attempt by [a] defendant to deceive the police is another

11

circumstance which infers guilt." **State v. Townsend**, 810 S.W.2d 726, 727 (Mo. App. E.D. 1991).

Yet another demonstration that Defendant could reasonably have been found to have acted in concert with Ward was Ward's familiar acknowledgement of Defendant at the county jail and Ward's statement that, "[T]hey got you too."

Thus, Defendant's actions before, during, and after the crime – association with Ward and Ivy prior to the crash; disobeying the deputy's commands; fleeing from the scene; giving misleading statements to a law enforcement officer; failing to reveal his presence at the crime scene area; and Ward's incriminating statement at the jail – all supported an inference that Defendant was a participant in the crime of trafficking illegal drugs as opposed to, for instance, an innocent acquaintance or an unfortunate hitchhiker who had thumbed a ride with the wrong person. *See **Townsend***, 810 S.W.2d at 727 (holding the evidence was sufficient to support the jury's verdict that the defendant had aided in the commission of a robbery where the defendant was with the robber prior to the robbery, entered the convenience store with the robber, stood by the robber during the robbery (impressing a show of force), left the store with the robber, and later lied to police about his whereabouts prior to the robbery)).

Defendant argues that, based upon the facts, it could certainly be reasonably inferred that Defendant knew about the brick of methamphetamine *after* Ward exposed it to view, but not necessarily before the Cruze crashed, claiming that the jury could only speculate that Defendant knew about Ward's drug trafficking enterprise. This argument ignores our standard of review and misconstrues the law that governs accomplice liability. *See **State v. Jackson***, 304 S.W.3d 791, 794 (Mo. App. W.D. 2010) (holding that under a theory of accomplice liability, affirmative participation in the enterprise is sufficient for co-defendant

12

liability even if the co-defendant does not know, or want to know, where drugs are being held). We must view all of the evidence in the light most favorable to the verdict, grant the State all reasonable inferences, and disregard all contrary evidence and inferences. *Mueller*, 568 S.W.3d at 66.

Viewed as required by our governing standard of review, the State adduced sufficient evidence from which a reasonable juror could find beyond a reasonable doubt that Defendant affirmatively participated in first-degree drug trafficking under an accomplice-liability theory. Point 1 is denied.

*Point 2 – Resisting Arrest by Fleeing*

Point 2 challenges the sufficiency of the evidence to support Defendant's conviction of resisting arrest, arguing that the State failed to establish that Defendant knew the deputy was effecting his arrest before Defendant fled or that the deputy was making an arrest of Defendant for felony possession of a controlled substance.

Count 2 of the amended information charged Defendant with felony-level resisting arrest ("felony resisting arrest"). Specifically, it alleged that "[the deputy] was making an arrest of [D]efendant for felony controlled substance and [Defendant] knew that the [deputy] was making an arrest, and, for the purpose of preventing the [deputy] from effecting the arrest, resisted the arrest of [D]efendant by fleeing from the [deputy]."

To prove that Defendant committed this crime, the State needed to establish the following three elements:

> (1) that [Defendant] knew or reasonably should have known that a law enforcement officer was making an arrest or attempting to lawfully detain or stop him;

> (2) that [Defendant] resisted this arrest, stop or detention by fleeing from that officer; and

13

(3) that [Defendant] did so for the purpose of preventing the officer from effecting the arrest, stop or detention.

*State v. Jones*, 479 S.W.3d 100, 109 (Mo. banc 2016). Defendant challenges only the first element: that he knew or reasonably should have known that the deputy was attempting to arrest him.

"Resisting arrest cannot occur unless the officer was in the process of arresting the defendant." *State v. Redifer*, 290 S.W.3d 184, 186 (Mo. App. W.D. 2009). The officer does not have to tell the person he is under arrest if the circumstances show that the officer is attempting an arrest. *State v. Nichols*, 200 S.W.3d 115, 121-22 (Mo. App. W.D. 2006); *See State v. Chamberlin*, 872 S.W.2d 615, 619 (Mo. App. W.D. 1994) (the officer's verbal commands and invocation of authority as a state trooper were sufficient evidence that the defendant should have known the officer was attempting an arrest). Once an officer is attempting to actually restrain or control the person of the defendant, an arrest is in progress. *State v. St. George*, 215 S.W.3d 341, 346 (Mo. App. S.D. 2007). The totality of the circumstances allows a jury to reasonably find police officers' intent to arrest a defendant to support a conviction of resisting arrest. *State v. Nickels*, 598 S.W.3d 626, 639-40 (Mo. App. E.D. 2020).

"The jury was entitled to consider what [Defendant] knew and what [Defendant] had just done when deciding whether [Defendant] had reason to know whether [the deputy] was attempting to arrest him[.]" *Jones*, 479 S.W.3d at 110-11 (citing *State v. Whitley*, 183 S.W. 317, 320-21 (Mo. 1916), for the proposition that, "[b]ut being guilty, and knowing his guilt thereof (as the inference is from the jury's verdict), the duty was by law incumbent on him to submit to this arrest, under penalty, if he refused")). In this case, the jury that found

14

Defendant guilty of felony trafficking was entitled to consider the following: Defendant had just been involved in a high-speed crash with a rollover; the deputy had ordered all occupants of the Cruze, including Defendant, to *stay down* and told them that an ambulance was on its way. When the occupants of the Cruze failed to obey the order to *stay down*, the deputy repeated his instructions to *stay down*.

The tension at the scene escalated when Ivy began screaming, trying to distract the deputy, and Ward began digging inside his pockets, prompting the deputy – a single officer facing three suspects – to fear that Ward was reaching for a gun, so the deputy drew his service weapon and pointed it at Ward. When Ward then flipped a large bag of methamphetamine out of his pocket instead of drawing a gun, "the tension just kind of went out."

At that point, the deputy holstered his weapon, took out his handcuffs, and started to go down the ravine. The deputy then said, "I am placing you under arrest." As soon as the deputy holstered his weapon and pulled his handcuffs, *all three* occupants of the Cruze jumped up. At that moment, Defendant fled the scene and hid from the police. When Trooper Call eventually found Defendant, Defendant claimed to have been swimming in a farmer's pond and did not mention anything about having been in a crash.

The deputy identified himself as law enforcement when he first came on the scene. He told all of the occupants of the Cruze to stay down because help was on the way. While this first command to Defendant and the other vehicle occupants was not *initially* in the context of the deputy attempting to make an arrest, the situation quickly escalated as the Cruze's occupants became non-cooperative and, as the deputy testified at trial, he realized "this is not a car wreck[;] there is something far worse going on here." Once the deputy drew

15

his gun on Ward, and especially once Ward flipped a large bag of illegal drugs out of his pocket onto the ground, a reasonable juror could find that Defendant knew or should have known that he was going to be arrested for his participation in transporting the drugs. The jury could reasonably infer that Defendant did not believe that the deputy intended to arrest Ward only because, if Defendant believed that, he would not have fled the scene and then concealed the fact that he was one of the persons who had been involved in the car crash when Trooper Call located him and asked him about what he had been doing.[6]

Point 2 is also denied, and the judgment of the circuit court is affirmed.

| | |
|---|---|
| JEFFREY W. BATES, J. – | CONCURS WITH SEPARATE OPINION AUTHOR |
| DON E. BURRELL, J. – | CONCURS |
| MARY W. SHEFFIELD, J. – | CONCURS |
| JENNIFER R. GROWCOCK, J. – | CONCURS IN PART AND DISSENTS IN PART IN SEPARATE OPINION |
| BECKY J.W. BORTHWICK, J. – | CONCURS |
| MATTHEW P. HAMNER, J. – | CONCURS |
| GARY W. LYNCH, Senior Judge – | CONCURS |

---

[6] The sufficiency of the evidence stands or falls upon the evidence actually adduced at trial and the reasonable inferences drawn from that evidence. *Mueller*, 568 S.W.3d at 66. In regard to Point 2, the dissent's reliance upon the *omission* of potential evidence on certain topics does not undercut the sufficiency of the evidence that was actually adduced at trial. Mentioning the absence of something is merely the dissent's vehicle for drawing inferences from the "missing" evidence that are contrary to the verdict. Such inferences must be rejected because our standard of review requires us to *ignore* inferences that are contrary to the verdict. *Cline*, 808 S.W.2d at 823. That requirement applies whether those contrary inferences are drawn from the evidence actually adduced at trial, as the dissent does in some instances, or are drawn from evidence that was not adduced, as the dissent does in other instances.



# Missouri Court of Appeals
## Southern District

### En Banc

STATE OF MISSOURI,         )
                                          )

     Plaintiff-Respondent,    )
                                          )

vs.                             )        No. SD37153
                                          )

CARL W. DILL, II,         )        **Filed: July 16, 2024**
                                          )

     Defendant-Appellant.    )

APPEAL FROM THE CIRCUIT COURT OF LAWRENCE COUNTY

The Honorable David A. Cole, Judge

## CONCURRING IN PART AND DISSENTING IN PART

I concur in the majority opinion with respect to the disposition of Point 1. I dissent from the majority opinion with respect to the disposition of Point 2.

The issue presented by Point 2 is whether the circumstantial evidence was sufficient for the jury to reasonably infer, beyond a reasonable doubt, that Defendant knew or should have known that the deputy was attempting to arrest Defendant at the time he fled. In deciding that question, it is important to remember that reliance on circumstantial evidence does not permit an appellate court to "supply missing evidence or give the state the benefit of unreasonable, speculative or forced inferences." *State v. Lehman*, 617 S.W.3d 843, 847 (Mo. banc 2021) (quoting *State v. Langdon*, 110 S.W.3d 807, 811-12 (Mo. banc 2003)).

1

A person commits the offense of resisting arrest under the resisting arrest statute, section 575.150.1,[1] if:

> (1) he knew or reasonably should have known that a law enforcement officer was making an arrest; (2) he resisted that arrest by using or threatening to use violence or physical force or by fleeing from the officer; and (3) he did so for the purpose of preventing the officer from completing the arrest.

*State v. Shaw*, 592 S.W.3d 354, 358 (Mo. banc 2019) (quoting *State v. Pierce*, 433 S.W.3d 424, 434 (Mo. banc 2014)).  Section 575.150.1 does not make flight from an officer a crime when no arrest is being made.  *State v. Dossett*, 851 S.W.2d 750, 752 (Mo. App. W.D. 1993). Here, the evidence viewed most favorably to the verdict does not support a conviction of resisting arrest because it failed to show that the deputy was arresting Defendant at all, much less that Defendant knew or reasonably should have known that the deputy was making an arrest.  The jury could not infer from the evidence presented that Defendant reasonably should have known that the deputy was arresting Defendant at the time he fled.

As demonstrated by the factual summary in the majority opinion, the deputy knew that Ward had been driving the Cruze recklessly at a high rate of speed before it violently crashed because he saw him punch out the driver's-side window of the Cruze with his fist and crawl out after the crash occurred when he stopped to check on the occupants in the Cruze.  The deputy heard other occupants still in the Cruze, who were identified as Ivy and Defendant. The deputy identified himself as law enforcement, initially told everyone to relax, asked if they were hurt, informed them he had help on the way, and directed them not to get up and walk around and to just stay down.  Ivy and Defendant then crawled out of the overturned vehicle.  Again, the deputy told everyone to stay down and that an ambulance was on its way.

---

[1] All references to statutes are to RSMo 2016, including changes effective January 1, 2017.

At that time, Defendant was standing by the passenger door on the side of the vehicle, which was furthest from the deputy. It was Ivy who approached the deputy, began screaming that she was pregnant, and tried to distract him away from Ward. After the deputy told her to "stay back, stay down, stay away," the deputy turned his attention back to Ward. It was then Ward who began digging in his pockets, which prompted the deputy to order Ward to stay down and take his hands out of his pockets. It was Ward who ignored those instructions, prompting the deputy to pull his gun and train it on Ward. The deputy screamed at Ward to keep his hands up where he could see them, keep his hands above his head, and lay down and relax, but Ward did not comply. The deputy was "very focused on [Ward], screaming at [Ward] saying stop, you know, don't make me shoot you." During the deputy's exchange with Ward, Defendant was at the back of the driver's side of the Cruze, watching the encounter. The deputy did not know if Defendant was standing or sitting at that time. Ward "flipped" the drugs from his pocket and dropped them on the ground a couple of feet away. After Ward "flipped" the drugs out of his pants, "the tension just kind of went out" and the deputy was "like, okay, dude, really," holstered his gun, pulled out his handcuffs and started to approach Ward, telling Ward, "I am placing **you** under arrest." (Emphasis added.) Ward took off running eastward. The deputy did not know if Defendant was on his feet at that time. Defendant then took off southward, but the deputy "was focused on Ward." He "gave chase to Ward." There was no evidence that the deputy paid attention to Defendant at all. The deputy never pursued Defendant or gave any verbal directive to him to stop before the deputy lost sight of Defendant. Ivy then interfered with the deputy's attempt to arrest Ward, he gained distance from the deputy, the deputy again pursued Ward until he was "out of gas[,]" and Ward escaped but was eventually arrested. Ivy engaged the deputy again, and he then

3

arrested her for obstruction. The deputy testified at trial as follows related to Ivy's arrest: "And I'm like lady you are under arrest. I pretty much detained her for obstruction for what she did coming up behind me. I detained her and I held her."

In my view, this evidence was not sufficient to prove beyond a reasonable doubt that Defendant knew or should have known that he was being arrested by the deputy. Because "[r]esisting arrest cannot occur unless the officer was in the process of arresting" Defendant, *State v. Redifer*, 290 S.W.3d 184, 186 (Mo. App. W.D. 2009), the evidence must sufficiently show that the deputy was actually in the process of arresting Defendant when he fled. It does not do so here.

> The gravamen of the offense is resisting an arrest, not flight from an officer. Accordingly, the offense of resisting arrest cannot occur unless a law enforcement officer actually contemplates an arrest. Resistance to an arrest must occur when the person knows that an officer is making an arrest. The arrest must be in progress when the "resistance" occurs. An arrest is in progress once the officer is attempting to actually restrain or control the person of the defendant.

*State v. Dickerson*, 499 S.W.3d 378, 381 (Mo. App. S.D. 2016) (quoting *State v. St. George*, 215 S.W.3d 341, 345-46 (Mo. App. S.D. 2007)). "Section 575.150.1(1) does not allow a conviction to be based on an intent to resist in the event an arrest is made later." *State v. Christian*, 184 S.W.3d 597, 603 (Mo. App. E.D. 2006). Again, "[t]he arrest must be *in progress* when the 'resistance' occurs." *Id.* (quoting *State v. Shanks*, 809 S.W.2d 413, 418 (Mo. App. E.D. 1991), *rev'd on other grounds*).

In *Dickerson*, this Court reasoned that the appellant in that case:

> may not have known nor should he have known that he was under arrest even when the officer said he wanted [a]ppellant to put his arms behind his back. It may have been a pure safety measure for the officers to request that a witness or a citizen keep their hands in view.

499 S.W.3d at 381. Applying this Court's reasoning in **Dickerson** to the facts of this case, the only evidence presented at trial of the deputy interacting with Defendant was before Ward flipped the drugs out of his pocket when he first came on the scene of the crash and told everyone to relax, asked if they were hurt, informed them he had help on the way, and directed them to not get up and walk around and to just stay down. Like in **Dickerson**, this too could have been a safety measure for both the deputy and the occupants of the crashed Cruze until medical help arrived. At that point, the deputy had no other known reason to place anyone under arrest and never testified that he intended to place anyone under arrest. The State presented no evidence that the deputy otherwise interacted with or directed any attention at Defendant at any other time.

Further, the deputy never testified as to his subjective intent regarding an arrest of Defendant. As explained by our Supreme Court in **Shaw**, "the officer's subjective intent is relevant because this evidence explains what prompted the officer to make the arrest and, therefore, aids the factfinder in determining whether the defendant was arrested 'because of' or 'on account of' an offense." 592 S.W.3d at 361. During the deputy's testimony, he was never asked whether he was trying to or intended to arrest Defendant when he fled. While the officer's testimony as to his intent is not mandatory, the jury only had the deputy's recital of his words and actions as the basis for drawing that inference. After Ward flipped the drugs on the ground, the deputy started to approach Ward and told him, "I am placing you under arrest." Ward was the only person the deputy told was being arrested initially, followed by Ivy for "what she did coming up behind [him]." The deputy never communicated with Defendant aside from the initial communication to the group right after the crash when nobody was in the process of being arrested at all. When Defendant ran, there was no

5

evidence of any communication to him, or any manifestation of an attempt to arrest him, by the deputy. *See **State v. Parham***, 645 S.W.3d 105, 109 (Mo. App. S.D. 2022) (State's evidence was insufficient to prove that defendant knew or should have known he was being arrested because, when he rode his bicycle away from officers, there was no evidence of communication or manifestation of an attempt to arrest him). Moreover, for the jury to infer that Defendant was being arrested at the time he fled, the jury would have to infer that all three individuals were being arrested at that time. However, the deputy's words and actions up to that point were not the basis for his arrest of Ivy either. She was detained and arrested later, after Defendant fled and after she engaged the deputy again after Ward escaped. He then detained and arrested her, but only for obstruction, not for anything related to the drugs.

In my view, the difficulty in this case is that, initially, the deputy's words and actions were directed at three people simultaneously when he came upon the accident scene, but his subsequent words, actions, and attention were exclusively directed at Ward and Ivy. Only Ward, out of the three people, was told he was being arrested before Defendant fled. These facts distinguish the case at bar from ***State v. Nichols***, 200 S.W.3d 115, 121-22 (Mo. App. W.D. 2006) (commands from uniformed officers for the lone suspect to show his hands, lay down, and put his hands behind his back were specific enough to indicate that the officers intended to handcuff and arrest him), and ***State v. Chamberlin***, 872 S.W.2d 615, 619 (Mo. App. W.D. 1994) (officer's verbal commands with his weapon drawn to "stop" and "don't move" when the defendant pulled over, exited his car, and took off on foot after an "aggressive" pursuit at high speeds where the officer had his emergency lights and siren, were sufficient evidence that the defendant should have known the officer was attempting an arrest). The majority reasons that "[o]nce the deputy drew his gun on Ward, and especially

6

once Ward flipped a large bag of illegal drugs out of his pocket onto the ground, a reasonable juror could find that Defendant knew or should have known that *he was going to be arrested* for his participation in transporting the drugs." (Emphasis added.) However, to secure a conviction against Defendant for resisting arrest, the State had to prove that Defendant knew or should have known that *he **was being arrested*** by the deputy, not that he ***was going to be arrested*** by the deputy sometime later. I believe this is a distinction with a difference here, and that there was insufficient evidence presented at trial that Defendant knew or should have known that he was being arrested by the deputy since the deputy was not in the process of arresting Defendant, or Ivy for that matter, when he fled.

For all of the foregoing reasons, I would grant Point 2 because I am unconvinced that the jury could infer, beyond a reasonable doubt, that Defendant knew or should have known he was being arrested.

JENNIFER R. GROWCOCK, J. – CONCURRING IN PART AND DISSENTING IN PART OPINION AUTHOR

7